IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JUSTIN LEE DOUGLAS,

Plaintiff,

v.

BROOKE STEINGRAEBER,

Defendant.

OPINION and ORDER

24-cv-848-jdp

Plaintiff Justin Lee Douglas, proceeding without counsel, alleges that a correctional officer, defendant Brooke Steingraeber, ignored his threat to harm himself. Douglas is proceeding on Eighth Amendment conscious-disregard-of-safety and Wisconsin-law negligence claims for damages. Steingraeber moves for summary judgment. Dkt. 28. Douglas opposes summary judgment, and he moves for sanctions based on the failure to preserve body-worn camera video of the events. Dkt. 46.

Sanctions are not appropriate because Steingraeber wasn't involved in the failure to preserve the video and there's no indication that prison officials failed to take reasonable steps to preserve it.

Regarding summary judgment, the undisputed facts are that Douglas is a dangerous and disruptive prisoner with a documented history of using self-harm to get what he wants. Douglas continued this pattern on the day in question by creating disturbances, including one in which he inflicted minor self-harm to get what he wanted. Douglas later demanded to use the telephone even though he had not signed up to use it and, after Steingraeber did not accommodate his request, he created another disturbance by punching and kicking his cell door. Douglas made threats of self-harm that Steingraeber did not immediately respond to, but

the evidence shows that she thought that he was creating a disturbance to get a phone call, which does not constitute conscious disregard of an inmate's safety. I will grant summary judgment to Steingraeber and close the case.

## MOTION FOR SANCTIONS

Douglas moves for sanctions, contending that Steingraeber disposed of body-worn camera video of the events. Dkt. 46. Douglas asks the court to presume that the unpreserved body-worn camera video was unfavorable to Steingraeber, and he seeks financial sanctions. *See* Dkt. 43 at 1; Dkt. 46. For the reasons explained below, I will deny the motion.

The basic rule is that Federal Rule of Civil Procedure 37(e) authorizes an appropriate sanction for the loss of relevant electronically stored information, if the party failed to take reasonable steps to preserve it. *See* Fed. R. Civ. P. 37(e); *Freidig v. Target Corp.*, 329 F.R.D. 199, 207 (W.D. Wis. 2018). Where, as here, the moving party asks the court to presume that the unpreserved information was unfavorable to the nonmoving party, the moving party must also show that the nonmoving party "acted with the intent to deprive [him] of the information's use in the litigation." *See* Fed. R. Civ. P. 37(e)(2); *see also Downing v. Abbott Lab'ys*, 48 F.4th 793, 812 (7th Cir. 2022) ("To obtain an adverse inference related to spoliation, a plaintiff must demonstrate that a defendant intentionally destroyed documents in bad faith."). The moving party must also show that the nonmoving party was personally involved in the failure to preserve the information. *See Bentz v. Lindenberg*, 854 F. App'x 55, 58 (7th Cir. 2021), or that the party involved in the failure to preserve acted as the nonmoving party's representative in carrying out that conduct, *see Pable v. Chicago Transit Auth.*, 145 F.4th 712, 722 (7th Cir. 2025).

In opposition to the request for sanctions, Steingraeber submits declarations from the litigation coordinator, Rebecca Keeran, and the security captain, Anthony Bonfiglio, at Columbia Correctional Institution (CCI). Dkt. 53 and Dkt. 54. Keeran says that she searched for any video related to Douglas that was preserved around December 21, 2021, when the incident occurred. Dkt. 53 ¶ 5. Keeran found preserved hallway video from Douglas's housing unit but could not find Steingraeber's body-worn camera video. *Id.* ¶¶ 5–6. There is no dispute that Steingraeber was wearing a body-worn camera when the incident occurred.

Bonfiglio says that, in 2021, CCI used two camera storage systems, one for stationary camera videos and the other for body-worn camera videos. Dkt. 54 ¶ 10. The system for body-worn camera videos, WatchGuard, was owned by Motorola, who provided technical support. *Id.* At the time, Bonfiglio says, all body-worn camera videos were uploaded to the WatchGuard servers, and Motorola had previously assured CCI officials that uploaded videos "would be retained in perpetuity." *Id.* ¶ 12.

The following account is given by Bonfiglio. In September 2021, multiple body-worn cameras began to fail and videos could not be uploaded from them. *Id.* ¶ 20. Motorola asked for the cameras to be returned and told CCI officials that all video on defective cameras was permanently deleted during the refurbishing process. *Id.* ¶¶ 21–22. The same month, WatchGuard servers began having "extreme difficulty," meaning that video could not be downloaded from them. *Id.* ¶ 23. The Department of Corrections information and technology department worked with technical support from Motorola for both the hardware and server problems to determine their cause. *Id.* ¶ 23; *see also* Dkt. 54-1.

CCI officials, Bonfiglio continues, later discovered the cause of both problems. The body-worn cameras were crashing and becoming inoperable because video had not been

uploading from them and they were "attempting to record data on an already full camera." Dkt. 54 ¶ 26. Motorola's servers, similarly, were "too full," stopping them from holding all videos "perpetually as previously promised." *Id.* ¶ 27. To make the system work, Motorola had to first remove videos from their servers and then set the system to automatically overwrite videos after 120 days. *Id.* ¶¶ 27, 29. Before the removal process began, CCI officials downloaded from the servers videos for which there were litigation requests. *Id.* ¶ 28.

Bonfiglio explains that, from November 2021 to February 2022, most of the body-worn camera video "was never uploaded from the cameras to the Motorola server due to technical issues with Motorola's system." *Id.* ¶ 30. Bonfiglio estimates that "80% of [body-worn camera] video was lost due to Motorola's system not working as promised." *Id.* Bonfiglio adds that Steingraeber, as a correctional officer, was not involved in processing prisoner requests to preserve video or in storing video. *Id.* ¶ 31.

The evidence shows that Steingraeber was not involved in processing Douglas's request to preserve the video or in the video's storage. Steingraeber was responsible for connecting her body-worn camera to a docking station at the end of her shift, *see id.* ¶ 18, but Douglas does not assert that she failed to fulfill this responsibility. The evidence is also that CCI was having pervasive technical problems with its body-worn cameras and servers, which explains why Keeran couldn't find the video. The hallway video was preserved, which also negates an inference of bad faith by CCI staff in handling Douglas's request to preserve video of the incident. Finally, the evidence is that CCI officials worked with a large technology company to implement a system for preserving body-worn camera video, and that they took swift action to correct the system when it started to fail. Douglas has not shown that Steingraeber (or any

other DOC official) failed to take reasonable steps to preserve the body-worn camera video, let alone that she intentionally destroyed it. I will deny the motion for sanctions.

## UNDISPUTED FACTS

When stating the undisputed facts, I will treat as admissible declaration testimony Douglas's submissions that he signed under penalty of perjury or had notarized. But I will not consider statements for which Douglas lacks personal knowledge, hearsay statements, or other statements that are inadmissible. With that, the following facts are undisputed unless noted.

### A. Douglas's mental health history, tendency to self-harm, and disruptive behavior

Douglas has been diagnosed with antisocial personality disorder and post-traumatic stress disorder. Dkt. 33-2 at 12. Douglas has a history of self-harm and suicidal ideation. *Id.* More specifically, Douglas says that he has a history of "hanging, overdosing[,] and cutting." Dkt. 43 at 3. Douglas adds that Steingraeber has "plenty" of knowledge of this history because she worked with him for "some time," but he doesn't specifically explain how she gained knowledge of the hanging and overdosing. *Id.*

DOC staff have documented that Douglas uses threats of self-harm to try to get what he wants. Dkt. 33-2 at 2, 4–5, 6, 8–9. Douglas acknowledges that he frequently commits acts of self-harm, but he disputes that he commits those acts to manipulate staff. Dkt. 44 ¶ 3. Douglas says that he harms himself, or threatens to harm himself, when staff mistreat him, which worsens his mental health problems, frustrates him, and makes him retaliate against staff. *See id.* ¶¶ 3, 7; Dkt. 47 ¶ 8. Douglas frequently engages in assaultive and sexually inappropriate behavior. *See* Dkt. 56 ¶ 5.

## B. Underlying self-harm incident

### 1. Prior disturbances that day

On December 21, 2021, Douglas was placed on temporary lockup status and transferred to the restrictive housing unit (RHU). Steingraeber started working at 2:00 p.m. that day, and she had to deal with several disturbances caused by Douglas. *See* Dkt. 56 ¶ 11.

At 2:30 p.m., Douglas complained about medical supplies left in his prior housing unit. Douglas scratched his harm with his fingernail to show Captain Tervonen that he was serious and so that he could speak with him. *See id.* ¶ 13.

### 2. Mobile phone unit and Douglas's version of the events

Phones in the RHU are on a rolling cart. The phone is placed outside the prisoner's cell door and the prisoner holds the receiver through the cell door's trap.

Prisoners on temporary lockup status receive one phone call a week. Prisoners must sign up the day before phones are offered to make a call. All calls must be completed by a set time in the evening. *See* Dkt. 56 ¶ 19.

Steingraeber says that, during her shift, she told Douglas that he would be allowed a phone call as an "add-on." Dkt. 34 ¶ 16. "Add-on," she explains, means that although Douglas was not scheduled to make a phone call, he would be allowed to make a call after the scheduled calls were finished if there was enough time. *Id.* Douglas says that he was never told that he was an "add-on," but he doesn't directly dispute that he failed to sign up to make a call. *See* Dkt. 44 ¶ 15.

Douglas says that, around 8:30 p.m., he asked Steingraeber to move the phone to his cell and that she responded that she was "doing medications" and that he would have to wait until she was finished. Dkt. 43 at 1. Douglas says that he told Steingraeber that the phones

stopped working at 8:55 p.m. and that she responded that it wasn't her problem. *Id.* At that point, Douglas says, he grew "very stressed out" and started threatening to cut himself. *Id.*; Dkt. 47 at 1. At 8:40 p.m., Douglas says, he started telling Steingraeber that he was "actively cutting," to which she responded that she "didn't care" and that she would "get there once her medications were done." Dkt. 43 at 3; Dkt. 47 at 1. At 8:50 p.m., Douglas adds, he started to scream loudly that he was bleeding "very badly," and Officer Noel Hill entered his tier to check on him. *See* Dkt. 47 at 1.

Douglas says that Steingraeber did not observe him cutting himself until she and Hill went to his cell. *See* Dkt. 1 ¶ 8; Dkt. 47 ¶¶ 2, 4. Douglas does not say what he used to cut himself.

**3. Hallway video and Steingraeber's version of the events**

The hallway video in Douglas's tier is not fully consistent with Douglas's timeline of the events. The video shows that Steingraeber did not enter his tier to deliver medications until 8:37 p.m. Dkt. 31-2 (7:12). A phone was in front of another prisoner's cell door at that time. *See id.*

Steingraeber says that, around 8:50 p.m., Douglas started yelling at her to move the phones. Dkt. 34 ¶ 21. She also says that she told Douglas that she needed to finish medication pass and that she wasn't sure when time was up for the prisoner who had the phone. *Id.* ¶ 22. According to Steingraeber, Douglas continued to yell at her to move the phones, shouted obscenities, and kicked and punched his cell door enough to make it shake. *Id.* Douglas concedes that he was kicking and punching the cell door and yelling, but he says that he acted this way because Steingraeber wasn't taking his threats of self-harm seriously. Dkt. 44 ¶ 29;

Dkt. 45 ¶ 9. Steingraeber had difficulty communicating with prisoners about their medications because of Douglas's behavior.

Douglas, Steingraeber says, threatened to "slice and dice" if she did not immediately give him the phone. Dkt. 34 ¶ 24. At 8:49 p.m., the prisoner who had the phone returned it to the receiver. Dkt. 31-2 (19:39–43). Steingraeber says that the prisoner decided that he was finished with his call because he could not hear due to the disturbance. *See* Dkt. 34 ¶ 25. Steingraeber says that she told Douglas that he was not receiving the phone immediately because he was an add-on and because he was behaving disruptively. *Id.* ¶ 26. Steingraeber explains that she did not think that it was appropriate to reward Douglas's disruptive behavior by giving in to his demands. *Id.*

At 8:51 p.m., Steingraeber wheeled the phone to a different prisoner's cell, after which she returned to the medication cart. Dkt. 31-2 (21:05–40). Steingraeber says that Douglas screamed loudly that he was going to "slice his wrists open." Dkt. 34 ¶ 27. She also says that she attempted to finish dispensing medication before attending to his threat of self-harm. *Id.*

**4. Initial response to Douglas's active self-harm**

Hill went to Douglas's cell at 8:52 p.m. *See* Dkt. 31-2 (22:04–12); Dkt. 56 ¶ 36. Hill saw Douglas harming himself and Steingraeber, who was close by, went to his cell to assist and noticed a laceration on his right wrist. *See* Dkt. 31-2 (22:12–30); Dkt. 56 ¶ 37.

Hill drew his OC spray and asked Steingraeber to open the trap to restrain Douglas. Douglas placed his hands through the trap and said that he was "done." Dkt. 56 ¶ 39. Douglas threatened to harm staff. Hill unsuccessfully tried to close the trap by kicking it shut. Steingraeber radioed for assistance and managed to close the trap. Lieutenant Christopher

Bortz and Institution Complaint Examiner Kyle Zenk went the scene and assumed handling the incident. Steingraeber left. Douglas eventually allowed Bortz to restrain him.

#### 5. Placement in bed restraints and medical care

Douglas was taken to a different area in the RHU. Security staff contacted psychological services staff, who ordered Douglas to be placed in five-point bed restraints due to his continued threats of self-harm.

At 9:42 p.m., Douglas refused to allow nursing staff to assess or treat his cut. *See* Dkt. 56 ¶ 49. He then physically resisted being placed in bed restraints; he tried to bite the officer who was applying the chest strap, and he threatened to assault Bortz and spit on staff. Staff eventually managed to finish applying the restraints.

At 11:10 p.m., while restrained, Douglas agreed to allow a nurse to assess his cut. The nurse noted a 2.5 cm x 0.5 cm right wrist laceration that bled moderately. *See* Dkt. 33-1 at 1. The nurse cleaned the wound and tried to apply a Steri-Strip to it, but its edges didn't line up well. *See id.* The nurse covered the wound with gauze and a self-adherent wrap. *Id.*

### C. Notice of state-law claim

Douglas served a notice of claim on the Attorney General on June 6, 2022, 167 days after December 21, 2021. *See* Dkt. 56 ¶ 56 (citing Dkt. 32-1). In the form, which he signed under penalty of perjury, Douglas wrote that, around 8:40 p.m., he yelled at Steingraeber during medication pass that it was his turn to use the phone and that she "just kept on walking." Dkt. 32-1 at 2.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Douglas is proceeding on Eighth Amendment conscious-disregard-of-safety and Wisconsin-law negligence claims for damages. *See* Dkt. 13 at 3, 5, 7.

**A. Federal-law claim**

The Eighth Amendment prohibits prison officials from consciously disregarding an excessive risk to prisoner safety, including serious acts of self-harm. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019). To prevail on his conscious-disregard-of-safety claim, Douglas must show that (1) he faced an objectively serious risk of harm that (2) Steingraeber consciously disregarded. *See Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006).

Conscious disregard requires that Steingraeber is subjectively aware of a substantial risk of serious harm. *See Farmer*, 511 U.S. at 837. That means that Steingraeber knew of facts from which the inference could be drawn that a substantial risk of serious harm existed, and she actually drew that inference. *See id.* Conscious disregard involves intentional conduct, or reckless conduct "so dangerous that the deliberate nature of the defendant's actions can be inferred." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The Supreme Court has compared the conscious disregard standard to criminal recklessness. *See Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015).

No reasonable juror could find that Steingraeber consciously disregarded any substantial risk that Douglas would harm himself. Prison staff have documented that Douglas uses threats of self-harm to try to get what he wants, and he acknowledges that he frequently commits acts of self-harm in response to perceived mistreatment. Douglas also frequently engages in assaultive and sexually inappropriate behavior. The evidence is that Douglas is a

disruptive, dangerous, and manipulative prisoner. *Cf. Fritsch v. Ries*, No. 23-cv-803-jdp, 2025 WL 1697182, at *4 (W.D. Wis. June 16, 2025) ("As this and other courts have acknowledged, prisoners sometimes use threats of self-harm to manipulate prison staff.").

Continuing this pattern, the day of the incident, Douglas caused several disturbances. At one point, he scratched his arm to try to get what he wanted, which is consistent with his documented history of using threats of self-harm to manipulate prison staff.

Douglas continued to behave disruptively by yelling at Steingraeber to allow him to use the telephone even though he had not signed up to use it. Douglas says that he was yelling because Steingraeber was ignoring his threats of self-harm, not because he wanted the phone. But Douglas wrote in his verified notice of claim that he "yelled that it was [his] turn on the phone" before making any threats of self-harm, Dkt. 32-1 at 2, and he hasn't explained why he says otherwise in his summary judgment materials, *see Higgins v. Mississippi*, 217 F.3d 951, 955 (7th Cir. 2000) (a party cannot by affidavit retract damaging admissions made in an earlier affidavit without a good explanation). Douglas was also kicking and punching the cell door. Again, Douglas says that he committed that conduct because Steingraeber was ignoring his threats, but he was still creating a disruption.

There was some delay before Steingraeber responded to Douglas's threats of self-harm. Douglas says that he asked Steingraeber to use the phone at 8:30 p.m., but the hallway video contradicts this statement; she didn't enter the tier until 8:37 p.m. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (court should not adopt version of facts contradicted by video when ruling on summary judgment motion). Douglas wrote in his verified notice of claim that he started yelling for the phone around 8:40 p.m., and he hasn't explained why he provided a different time in his summary judgment materials. *See Higgins*, 217 F.3d at 955. So Douglas could not

have started to tell Steingraeber that he was going to cut himself until around 8:40 p.m. She went to his cell at 8:52 p.m., so the record supports a reasonable jury finding that the delay was between 10 and 15 minutes.

But a mere delay in responding to a threat of self-harm does not prove an Eighth Amendment violation; the delay must show that Steingraeber consciously disregarded a substantial risk that Douglas would inflict serious self-harm. A reasonable factfinder could not draw that conclusion here. Steingraeber says that she did not think that it was appropriate to reward Douglas's disruptive behavior by giving in to his demands. The evidence confirms Steingraeber's statement that Douglas was disrupting prison operations. He started yelling at her to allow him to use the phone even though he had no guarantee to use it. Douglas concedes that he was yelling and kicking and punching the cell door because Steingraeber did not immediately respond to his threats of self-harm, and she had difficulty communicating with prisoners about their medications because of the disruption. Douglas, a dangerous and disruptive prisoner, had created several other disturbances that day, including one in which he inflicted minor self-harm to get what he wanted. The evidence does not support a reasonable jury finding that Steingraeber disregarded Douglas's threats of self-harm for a non-correctional reason. Rather, the evidence shows that Steingraeber failed to "realize[] the [alleged] gravity of [Douglas's] threats amid the chaotic circumstances on the prison floor." *See Fitzpatrick v. Nys*, 861 F. App'x 108, 112 (7th Cir. 2021). Or put differently, the evidence shows that Steingraeber thought that Douglas was using threats of self-harm to try to get an unwarranted phone call rather than as a sincere expression of an intent to harm himself.

Other facts belie the notion that Steingraeber consciously disregarded Douglas's threats. Douglas concedes that Steingraeber did not observe him cutting himself until she went to his

cell. And it's undisputed that Steingraeber promptly joined Hill's efforts to respond to the situation and radioed for additional assistance from staff. These steps "do not reflect something approaching a total unconcern for [Douglas's] welfare," as is necessary to prevail on a conscious disregard claim. *See id.* Douglas says that Steingraeber took these steps to "save face," but this statement is conclusory and purely speculative on Douglas's part.

Douglas says that he did not harm himself to get a phone call. He explains that this episode was a psychological reaction to mistreatment by Steingraeber. But, again, there is no admissible evidence that Douglas had a guarantee to use the phone and, even if he did, he did not have a right to disrupt prison operations to obtain that privilege. *See McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019) ("Deference must be accorded to prison administrators in the adoption and execution of policies and practices that are needed to preserve order and ensure institutional security."); *cf. Caffey v. Maue*, 679 F. App'x 487, 490 (7th Cir. 2017) ("Inmates retain a First Amendment right to complain about prison staff, whether orally or in writing, but only in ways consistent with their status as prisoners."). As noted, even if Douglas was experiencing a genuine mental health crisis, the evidence does not support a reasonable jury finding that Steingraeber thought that to be the case.

Douglas contends that Steingraeber made a dismissive remark that shows conscious disregard. He says that after he started telling her that he was "actively cutting," she responded that she "didn't care" and that she would "get there once her medications were done." But, again, Steingraeber had ample reasons to think that he was creating a disturbance and manipulating her, and the Eighth Amendment does not require prison staff to have "genteel language" or "good manners." *See Lisle v. Welborn*, 933 F.3d 705, 719 (7th Cir. 2019).

Douglas contends that Steingraeber's actions violated prison policies governing prisoners who threaten self-harm. Even if this were true, a "violation of a jail policy is not a constitutional violation enforceable under 42 U.S.C. § 1983." *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020); *see also Est. of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (violation of a prison regulation or policy does not show conscious disregard); *Schroeder v. Sawall*, 747 F. App'x 429, 431 (7th Cir. 2019) (same).

To recap, no reasonable factfinder could conclude that Steingraeber consciously disregarded any substantial risk that Douglas would harm himself. I will grant summary judgment to Steingraeber on the Eighth Amendment claim.

**B. State-law claim**

Steingraeber contends that Douglas's state-law negligence claim fails because he did not file a notice of claim within 120 days of the incident in accordance with Wis. Stat. § 893.82. It's undisputed that Douglas filed his notice of claim 167 days after the incident. Douglas asks the court to excuse the delay, attributing it to a prison transfer, missing his personal property after the transfer, and a delay in obtaining a legal loan.

Section 893.82(3) provides that "no civil action . . . may be brought against any state . . . employee . . . for or on account of any act growing out of or committed in the course of the discharge of the . . . employee's . . . duties, . . . unless within 120 days of the event causing the injury, . . . the claimant . . . serves upon the attorney general written notice of [the] claim." "Section 893.82 is jurisdictional and *strict* compliance is required." *Weinberger v. Wisconsin*, 105 F.3d 1182, 1188 (7th Cir. 1997); *see also Riccitelli v. Broekhuizen*, 227 Wis. 2d 100, 116 (1999) ("No time exception [under § 893.82(3)] is permitted.").

Douglas did not comply with § 893.82(3)'s 120-day deadline, so his negligence claim is barred. Douglas asks for equitable tolling, but this doctrine does not apply to § 893.82(3)'s deadline. *See Weinberger*, 105 F.3d at 1188. I will grant summary judgment to Steingraeber on the negligence claim.

ORDER

IT IS ORDERED that:

1. Plaintiff Brooke Steingraeber's motion for summary judgment, Dkt. 28, is GRANTED.
2. Plaintiff Justin Lee Douglas's motion for sanctions, Dkt. 46, is DENIED.
3. Steingraeber's motion to stay deadlines and trial date, Dkt. 57, is DENIED as moot.
4. Steingraeber is to be recaptioned as "Brooke Steingraeber."
5. The clerk of court is directed to enter judgment and close the case.

Entered November 6, 2026.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge